Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/04/2018 08:10 AM CDT

In re Estate of Glenn G. Forgey, deceased.
Dean R. Forgey et al., appellants and cross-appellees,
v. Lyle A. Forgey, individually and as Trustee,
appellee, cross-appellant, and cross-appellee,
and Bessie I. Forgey-McCoy et al.,
appellees and cross-appellants.

___ N.W.2d ___

Filed February 9, 2018.    No. S-16-1027.

1. **Trusts: Equity: Appeal and Error.** Absent an equity question, an appellate court reviews trust administration matters for error appearing on the record; but where an equity question is presented, appellate review of that issue is de novo on the record.

2. **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue.

3. ____: ____. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

4. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

5. ____: ____. An appellate court, in reviewing a judgment for errors appearing on the record, will not substitute its factual findings for those of the trial court when competent evidence supports those findings.

6. **Judgments.** The existence of a fiduciary duty and the scope of that duty are questions of law for a court to decide.

7. **Judgments: Appeal and Error.** On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below.

8. **Wills: Trusts.** The interpretation of the words in a will or a trust presents a question of law.

9. **Attorney Fees: Appeal and Error.** A trial court's decision awarding or denying attorney fees will be upheld on appeal absent an abuse of discretion.

10. **Judgments: Words and Phrases.** A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result.

11. **Trusts.** A trustee has the duty to administer the trust in good faith, in accordance with its terms and the purposes and the interests of the beneficiaries, and in accordance with the Nebraska Uniform Trust Code.

12. ____. The Nebraska Uniform Trust Code states that trustees owe the beneficiaries of a trust duties that include loyalty, impartiality, prudent administration, protection of trust property, proper recordkeeping, and informing and reporting.

13. **Accounting.** An accounting is ordinarily an appropriate remedy for a breach of the duty to inform and report.

14. **Decedents' Estates: Jurisdiction.** County courts have exclusive jurisdiction over all matters relating to decedents' estates, including the probate of wills and construction thereof.

15. **Decedents' Estates: Jurisdiction: Equity.** In exercising exclusive original jurisdiction over estates, county courts may apply equitable principles to matters within probate jurisdiction.

16. **Decedents' Estates: Jurisdiction: Wills: Trusts: Minors: Mental Competency.** County courts have jurisdiction over all subject matter relating to estates of decedents, including construction of wills and determination of heirs and successors of decedents, estates of protected persons, protection of minors and incapacitated persons, and trusts.

17. **Courts: Jurisdiction.** County courts have full power to make orders, judgments, and decrees and to take all other actions necessary and proper to administer justice in the matters which come before them.

18. **Trusts.** If a trust has two or more beneficiaries, a trustee has a duty of impartiality among beneficiaries.

19. **Attorney Fees.** Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of an attorney fee.

20. **Attorney Fees: Appeal and Error.** When an attorney fee is authorized, the amount of the fee is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion.

21. **Attorney Fees.** To determine the value of legal services rendered by an attorney, it is proper to consider the amount involved, the nature of the litigation, the time and labor required, the novelty and difficulty of the questions raised, the skill required to properly conduct the case, the

responsibility assumed, the care and diligence exhibited, the result of the suit, the character and standing of the attorney, and the customary charges of the bar for similar services.

22. **Laches.** Laches occurs only if a litigant has been guilty of inexcusable neglect in enforcing a right and his or her adversary has suffered prejudice.

23. **Laches: Equity.** Laches does not result from the mere passage of time, but because during the lapse of time, circumstances changed such that to enforce the claim would work inequitably to the disadvantage or prejudice of another.

24. **Laches.** What constitutes laches depends on the circumstances of the case.

Appeal from the County Court for Keya Paha County: James J. Orr, Judge. Affirmed in part, and in part reversed and remanded with directions.

David A. Domina, of Domina Law Group, P.C., L.L.O., for appellants.

Michael L. Johnson, of Leininger, Smith, Johnson, Baack, Placzek & Allen, for appellee Lyle A. Forgey.

Kyle S. Irvin for appellees Bessie I. Forgey-McCoy et al.

Miller-Lerman, Stacy, Kelch, and Funke, JJ., and Arterburn, Judge.

Kelch, J.

## I. INTRODUCTION

This appeal arises from a trustee's failure to distribute the corpus of the trust following the grantor's death in 1993. Marvel Forgey and her three children, all beneficiaries of the Glenn G. Forgey Revocable Trust (the trust), appeal the order of the county court for Keya Paha County resulting from their suit against Lyle A. Forgey, who was another beneficiary and was the trustee. Marvel and her children sought to remove Lyle as trustee, secure administration of the trust, value the trust assets, divide those assets into separate trusts for the beneficiaries, and determine liabilities for alleged breaches of

fiduciary duties by Lyle. Bessie I. Forgey-McCoy and her two children, all three also beneficiaries, joined as interested parties. Primarily accepting Lyle's version of the facts, the county court valued and distributed the trust assets, assessed damages against Lyle for estate tax interest and penalties, and declined to award attorney fees or costs to any party. Marvel and her children appealed; Lyle cross-appealed, and Bessie and her children filed a separate cross-appeal. While we largely agree with the county court's findings in this case, we conclude that the county court committed error by not awarding damages for Lyle's untimely reports and accountings of his failure to collect rents on behalf of the trust. We further determine that the county court abused its discretion in declining to award attorney fees to Marvel, Bessie, and their respective children. Accordingly, we affirm in part, and in part reverse and remand with directions.

## II. BACKGROUND

Glenn G. Forgey died in 1993. He was survived by three children: Lyle and Bessie, mentioned above, and Wayne Forgey, who is now deceased. Wayne was survived by his wife, Marvel, and by their three children.

During his lifetime, Glenn transferred property into the trust. Lyle has been the sole trustee at all relevant times. The trust gave the trustee broad discretion to make decisions for the trust in good faith. It required the trustee to provide an annual report to the beneficiaries upon Glenn's death. The trust further directed the trustee, upon the grantor's death, to use the principal or net income of the trust to pay the grantor's legal debts, death expenses, estate administration costs, and inheritance and estate taxes. The trust, as amended, further provided:

> Upon the death of the Grantor and distribution of the Grantor's estate from probate, the Trustees shall divide the *residue* of the assets of this trust . . . into *equal shares*, so as to provide one share for each then living child of the Grantor and one share for the then living issue, collectively, of each deceased child of the Grantor. In so

dividing the assets of [this trust], . . . *in funding* [*Lyle's*] *equal share of the trust assets the Trustees shall allocate to his share all common stock which* [*this trust*] *may then own in* [a bank in Ainsworth, Nebraska].

(Emphasis supplied.)

No administrative proceedings were commenced for the trust until 2013, when Marvel initiated this litigation, along with her children (hereinafter collectively Marvel). Bessie and her two children (hereinafter collectively Bessie) joined the action as interested parties. Marvel sued to remove Lyle as trustee, secure administration, value assets, divide and distribute them to separate trusts, determine liabilities for defalcations by Lyle, and recover attorney fees and costs.

Bessie filed her own counterpetition, requesting similar relief.

Lyle also counterpetitioned, asking the county court to approve his actions as trustee; determine or confirm the allocation of trust assets, income, expenses, and compensation; and award him attorney fees and costs.

The sections immediately below summarize evidence relevant to the parties' claims on appeal, and we recount additional relevant facts in the analysis portion of this opinion.

### 1. DIVISION

Pretrial litigation revealed that the corpus of the trust included agricultural real estate, bank stock, cash, and a promissory note.

The county court, observing that the trust provided that trust assets were to be distributed upon Glenn's death, applied the principle that equity considers that done which ought to have been done and treated the division of the trust as though it had occurred upon Glenn's death.

The county court further determined that "it was clearly Glenn's intent that his trust be divided equally and that Lyle's one-third share be funded using the bank stock and that the remaining assets would be divided between Wayne's trust and Bessie's trust."

In dividing the trust this way, the county court relied on the testimony and report provided by Lyle's expert, Tyler Bartruff, an attorney working in the field of forensic accounting and federal estate taxes.

Bartruff based his report on the hypothetical assumption that the trust was split into three equal shares as of Glenn's date of death in 1993. The report also assumed that the federal estate tax return was timely filed and that the tax was timely paid on a deferred basis under I.R.C. § 6166 (2012). The report allocated the bank stock to Lyle's share and added additional liability to Lyle's share to make the three shares proportionate. Bartruff's report then proceeded with a cashflow summary for each beneficiary's share from the split in 1993 until December 31, 2015, using data provided in other exhibits.

## 2. Valuation

### (a) Bank Stock

At the time of trial, the trust owned 13,276 shares (bank stock), or 66.2 percent, of the holding company for a bank in Ainsworth, Nebraska. Lyle owned the remaining shares in his individual capacity.

Two witnesses testified about the bank stock's value: Janet Labenz and Fred Lockwood, each a certified public accountant (CPA) with experience in bank valuation.

Labenz' testimony and her written report gave a clear and concise explanation of her reasoning, which resulted in her applying a lack of marketability discount and valuing the trust's bank stock at $7,209,000 as of September 13, 2013.

Lockwood did not apply a lack of marketability discount and valued the trust's bank stock as of September 30, 2013, at $9,804,000. Counsel were unable to elicit a straightforward explanation to support Lockwood's conclusion; and because Lockwood was not a certified valuation analyst, as was Labenz, he was unable to submit a written report.

The county court expressly accepted Labenz' $7,209,000 valuation of the bank stock.

## (b) Land

Upon Glenn's death, the trust owned three substantial parcels of agricultural real estate located in Brown and Keya Paha Counties in Nebraska and in Tripp County in South Dakota.

On January 15, 2016, the Brown County real estate was distributed and sold by stipulation of the parties. The sale price of $9,148,172.70 was equally distributed to the separate trusts for Wayne and Bessie.

At trial, Marvel's counsel presented the reports of Larry Radant, who appraised the three parcels as of 2015. Radant determined values of $1,065,000 for the Keya Paha County real estate, $5,630,000 for the Tripp County real estate, and $9,700,000 for the Brown County real estate.

In addition, Marvel's counsel also presented values for the Keya Paha County and Tripp County real estate prepared by a different appraiser.

The county court relied on the real estate values established by Radant, valuing the trust's real estate at $16,395,000 total. This valuation included Radant's appraisal of the Brown County real estate, which had been previously sold below Radant's appraised value.

## (c) Cash

The county court awarded the parties cash based on Bartruff's report, which calculated each party's share of the trust had Lyle divided the trust into three equal shares upon Glenn's death, timely filed the estate tax return, and paid the associated taxes on a deferred basis. That report allocated the trust's cash as follows: $1,960,910 to Lyle and $382,169 to Wayne and Bessie ($191,084.50 to Wayne and $191,084.50 to Bessie). The county court apparently considered past distributions to Bessie totaling $167,550 and added these distributions to Bartruff's total of $382,169. Accordingly, the county court awarded $1,960,910 to Lyle's trust and divided $549,719 between Wayne's trust and Bessie's trust, resulting in $274,860 to Wayne's trust and $274,860 to Bessie's trust. The county

court then subtracted $167,550 from Bessie's share, allocating $107,310 to Bessie's trust.

### (d) Bradley Williams Note

The parties do not dispute that as of the time of trial, Bradley Williams owed the trust $61,423. As described in more detail below, the county court allocated the note representing that debt to Lyle in its final distribution, deducted its cash value from Lyle's trust, and divided its cash value equally between Wayne's and Bessie's trusts.

### 3. BREACHES OF FIDUCIARY DUTY

Marvel and Bessie presented evidence attempting to show various breaches of fiduciary duty by Lyle and resulting damages.

### (a) Estate Taxes

The parties do not dispute that Lyle was late in filing the trust's federal estate tax return and in paying the resulting tax liability. There was evidence that although Lyle's CPA, Bruce Hocking, timely prepared the federal estate tax return for Lyle's signature, Lyle neglected to sign and mail it on time. Due to Lyle's tardiness, the Internal Revenue Service (IRS) assessed penalties and interest against the trust amounting to approximately $2,200,000.

To pay the estate tax liability, Lyle obtained loans for the trust, borrowing from himself in his individual capacity and from the bank in which he and the trust held stock. Hocking admitted that this benefited Lyle, as owner of one of the notes representing the trust's debt and a shareholder at the bank, more than it benefited Wayne and Bessie. However, neither Marvel nor Bessie wanted Lyle to sell the trust's land to pay the federal estate tax obligation; nor did Bessie want Lyle to sell the bank stock.

Hocking negotiated with the IRS and achieved a settlement which allowed the trust to deduct the interest on the loans as an administrative expense, which, in turn, directly reduced

the federal estate tax liability and resulted in a fiduciary income tax benefit.

Using the settlement negotiated by Hocking, Bartruff, Lyle's expert, opined that the trust incurred damages totaling $854,803 as a result of Lyle's late payment to the IRS. Bartruff explained that this number represented the difference between the amount that the trust actually paid for estate taxes, penalties, and interest and what would have been paid had the estate tax return been timely filed and had a proper election under § 6166 been made.

Lockwood, Marvel's expert, testified that the damage to the trust for Lyle's breach regarding the estate taxes, penalties, and interest was $2,258,141. To obtain this figure, Lockwood added $552,052 in penalties to $1,706,089, which included interest on the principal ($976,432), interest for federal penalties ($308,339), interest on the bank note ($380,734), and interest on money borrowed from Lyle ($141,382). However, Lockwood overlooked that the $976,432 in interest on the principal already included $308,339 in interest for penalties.

The county court accepted the testimony of Lyle's expert, Bartruff, on the matter of damages related to federal estate taxes. Accordingly, the county court determined that Lyle's breach of his duty to timely handle matters pertaining to estate taxes damaged the trust in the amount of $854,803.

### (b) Cattle Operation Rents

Marvel and Bessie alleged a breach of trust by Lyle for failing to charge rent to himself and to Wayne for use of the trust's land for their cattle operations.

Prior to Glenn's death, Glenn, Lyle, and Wayne conducted a cattle operation using 12,000 acres of pasture belonging to Glenn, as well as real estate belonging to Lyle and Wayne. Glenn, Lyle, and Wayne shared the profits 20 percent, 45 percent, and 35 percent, respectively. At some point, the land became part of the trust. After Glenn's death, from 1993 to 2009 or 2010, Lyle and Wayne continued to share the cattle

operation on the same terms, with the trust assuming Glenn's 20 percent.

After Glenn's death, Lyle paid no rent to the trust, nor did Lyle collect rents from Wayne on behalf of the trust. Lyle testified that the cattle operation handled rents in this manner before Glenn's death.

Lyle testified that the trust's cattle operation used some of his land and his labor, management, and equipment and that he did not charge the trust, nor did the trust pay Wayne, for his labor, management, and equipment. Lyle also testified that the trust did not pay for using pastureland owned by the family's limited partnership or for any inputs for crops grown there and used to feed the trust's cattle. However, there was also evidence that the trust borrowed money for feed, other general operating expenses, and real estate taxes for its portion of the cattle operation.

Lyle pointed out that the terms of the cattle operation allowed the trust to pay down its federal estate tax obligation without selling trust property.

Marvel did the bookkeeping for Wayne, and she testified that when they settled up each year, they did not have any claim against the trust.

Marlin Krohn, an agricultural land manager, testified that based on the industry standard, the value of Lyle's and Wayne's labor and management of the cattle operation was $550,000 from 1994 to 2009. Krohn further testified that had the trust's pastureland been rented out at market rates between 1993 and 2009, those rents would have totaled $2,100,000. He opined that the trust could have received $600,000 more in net income if the cattle had been liquidated in 1993 or 1994 and the real estate leased from that time until 2009, yet that it was reasonable for the cattle operation to have continued. Krohn observed that cattle feeding operations were profitable in 1993 or 1994, despite the subsequent unexpected downturn in the market.

The county court found that Lyle and Wayne ran the cattle business with Glenn until his death and that there was never

an agreement that they would be charged rent to continue using the land. The county court also noted that continuing the cattle operation under those terms allowed for the payment of tax liability. Thus, it found that Lyle's actions regarding this issue were authorized and of benefit to the beneficiaries. Consequently, the county court assessed no damages against Lyle arising from the cattle operation.

### (c) Cash Distributions

Lyle did not make cash distributions from the trust to the other beneficiaries until 2008. It was alleged that this was a breach of Lyle's fiduciary duty.

In 2008, 2009, and 2010, Bessie received distributions totaling $167,550. Bessie testified that during this period, she told Lyle when she needed money from the trust and he would give her money, sometimes a little more than she requested. Bessie testified that she had the understanding that she chose to forgo her distributions prior to 2008 to facilitate payment of IRS obligations and avoid the trust's having to sell land or bank stock.

After Marvel filed suit in 2013, Lyle began making equal trust income distributions. In 2015, the county court ordered equal distributions to separate trusts for Lyle, Wayne, and Bessie.

Joel Wiegand, a CPA, calculated that if all the distributable income had been distributed from the trust to Bessie for her one-third share, total taxes for one-third of the trust tax plus Bessie's individual tax would have been $124,265 lower for 1993 through 2012. Wiegand pointed out that cash distributions did not become available until 2008 when debts were retired. According to Wiegand, Bessie would have been taxed $37,284 less had a one-third share of cash been distributed to her when available in 2008 and thereafter. Wiegand opined that it was prudent to retain funds to make payments on debts incurred to pay federal estate taxes.

Hocking, Lyle's CPA, testified that until all federal estate tax obligations were paid in full in 2000, he advised Lyle

from time to time that no distributions should be made to the trust beneficiaries. He testified that at that time, an election under § 6166 was still a possibility, and that § 6166 required any distributable trust income to be used to defray federal estate tax liability.

Lockwood testified that the lack of distributions allowed more assets to remain in the trust and resulted in $191,381 of excess, avoidable taxes.

The county court accepted Wiegand's testimony that the available cash of the trust did not exceed its liabilities until 2008. Because Lyle's refusal to make cash distributions allowed the tax liability to be paid without selling trust assets, the county court found that Lyle's actions allowed the trust to grow from approximately $3 million at Glenn's death to over $25 million at the time of trial and thus actually benefited the beneficiaries. Additionally, the county court noted that Bessie received $167,550 of cash distributions and that Bessie herself testified that Lyle distributed cash to her whenever she asked and sometimes gave her more than she requested.

### (d) Williams Note

Marvel and Bessie claimed that Lyle breached his fiduciary duty and caused damages by failing to collect on the Williams note. At the time of Glenn's death in 1993, Williams owed the trust $136,423. The record shows payments of $25,000 in 2004 and $40,000 in 2013. Deducting these payments results in a balance of $71,423, but no one disputes that the balance was $61,423 at the time of trial. Lockwood testified at trial that he learned that Lyle believed he could collect the balance of the note.

The county court found that there was no evidence as to how Lyle breached his fiduciary duties in not collecting the debt. It concluded that equity required allocating the note to Lyle's trust, deducting $61,423 in cash from Lyle's distribution and distributing $30,711 in cash to Wayne and $30,711 in cash to Bessie.

On appeal, Marvel claims that the county court ought to have allocated the note to Lyle. This is what the county court did in the body of its order, but as described in more detail below, the allocation is not entirely clear on the county court's balance sheet.

### (e) Failure to Account

Marvel claimed that Lyle had failed to abide by the terms and purposes of the trust by failing to maintain sufficient records and to account for trust income and expenses annually. Bessie made similar claims.

Lyle admitted that as trustee, he had not provided a formal accounting. Members of Wayne's family and Bessie's family confirmed that prior to the litigation, they had not received any report or balance sheet that gave a picture of the trust's affairs.

According to the transcript of a family meeting in 2008, Hocking provided Wayne's family and Bessie's family with the trust's fiduciary income tax returns from 1993 through 2007. At the 2008 meeting, Hocking also provided income tax returns for the trust showing a "general ledger," rather than a transaction-by-transaction account, for the income and expenses of the trust from 2003 to 2007.

In 2013, Lyle provided the other beneficiaries with fiduciary income tax returns from 1993 to 2012. After the proceedings commenced in 2013, Lyle provided a full accounting for 2003 to 2012 to Wayne's family and Bessie's family. During the litigation, Lyle provided accountings and fiduciary income tax returns for 2013 to 2015.

The county court found no showing that the untimely accounting caused any loss to the beneficiaries and awarded no damages.

### 4. Attorney Fees and Costs

All parties requested attorney fees and costs. The county court conducted a posttrial hearing on the matter and received affidavit evidence.

The county court determined that each party should pay his or her own attorney fees and costs. It noted that while it did not believe Lyle had poor intentions, his own actions and neglect opened the door to accusations of breaches of fiduciary duty. As for the remaining parties, the county court noted that most of their claims against Lyle lacked merit and amounted to "microscopically probing" Lyle's actions for nearly criminal activity with the goal of "receiving a bigger piece of the pie," while contingency agreements between the parties and their counsel "fan[ned] the flames."

### 5. County Court's Final Distribution

In accordance with its analysis, the county court ordered Lyle to distribute the trust's assets as follows:

**Lyle's Trust**

| | |
|---|---:|
| Bank Shares | $7,209,000 |
| Cash | 1,960,910 |
| Estate Tax Penalties and Interest | (854,803) |
| Adjustment for Williams Note, Allocated to Lyle | (61,423) |
| TOTAL for Lyle | $8,253,684 |

**Wayne's Trust**

| | |
|---|---:|
| One-half Land | $8,197,500 |
| Cash for one-half Williams Note | 30,711 |
| Cash | 274,860 |
| TOTAL for Wayne | $8,503,071 |

**Bessie's Trust**

| | |
|---|---:|
| One-half Land | $8,197,500 |
| Cash for one-half Williams Note | 30,711 |
| Cash | 274,860 |
| Cash Adjustment | (167,550) |
| TOTAL for Bessie | $8,335,521 |

## III. ASSIGNMENTS OF ERROR

On appeal, Marvel assigns the county court erred when it (1) held that no damages were associated with Lyle's failure to render accountings; (2) failed to hold Lyle liable for excess interest on estate tax debt caused by failure to pay taxes on

time and for loss of installment payment interest benefits; (3) failed to find that Lyle caused damages for loss of the alternative valuation election of § 6166, requiring payment of avoidable taxes; (4) failed to value assets as of the filing date or the date of trial and to assess damages for delayed administration; (5) awarded Lyle substantially all trust income retroactively to the time of Glenn's death; (6) failed to award damages against Lyle for nonpayment of rents; (7) failed to award damages against Lyle for failure to collect valid debts owed to the trust; and (8) failed to award attorney fees and costs to Marvel.

On cross-appeal, Bessie assigns that the county court erred in (1) retroactively and hypothetically setting the creation of the shares of the trust as of the date of Glenn's death in 1993 and then awarding Lyle substantially all trust income retroactively to Glenn's date of death; (2) considering Lyle's actions as trustee in failing to collect rents from both himself and Wayne; (3) failing to award Bessie damages for Lyle's failure to distribute income to Bessie, consistent with the testimony of Wiegand; (4) failing to award Bessie attorney fees against Lyle for his multiple breaches of trust; and (5) holding that no damages were associated with Lyle's failure to render accountings.

On cross-appeal, Lyle assigns that although the county court properly divided the trust, it erred in (1) failing to hold that the claims for breach of fiduciary duty were barred by laches, because there should be no damages for breach of fiduciary duty if income from the bank stock is not allocated to Lyle's trust since Glenn's death; (2) failing to hold that Wayne's family and Bessie's family are barred from claims for breach of fiduciary duty by estoppel, waiver, release, consent, ratification and acquiescence; and (3) failing to award attorney fees, costs, and expenses to Lyle.

## IV. STANDARD OF REVIEW

[1-3] Absent an equity question, an appellate court reviews trust administration matters for error appearing on the record;

but where an equity question is presented, appellate review of that issue is de novo on the record. *In re Margaret Mastny Revocable Trust*, 281 Neb. 188, 794 N.W.2d 700 (2011). In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue. *Id.* When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *In re Estate of Radford*, 297 Neb. 748, 901 N.W.2d 261 (2017).

[4,5] When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Trust of Rosenberg*, 273 Neb. 59, 727 N.W.2d 430 (2007). An appellate court, in reviewing a judgment for errors appearing on the record, will not substitute its factual findings for those of the trial court when competent evidence supports those findings. *In re Estate of Dueck*, 274 Neb. 89, 736 N.W.2d 720 (2007).

[6,7] The existence of a fiduciary duty and the scope of that duty are questions of law for a court to decide. *In re Estate of Stuchlik*, 289 Neb. 673, 857 N.W.2d 57 (2014), *modified on denial of rehearing* 290 Neb. 392, 861 N.W.2d 682 (2015). On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *Id.*

[8] The interpretation of the words in a will or a trust presents a question of law. *In re Estate of Shell*, 290 Neb. 791, 862 N.W.2d 276 (2015).

[9,10] A trial court's decision awarding or denying attorney fees will be upheld on appeal absent an abuse of discretion. *In re Conservatorship of Abbott*, 295 Neb. 510, 890 N.W.2d 469 (2017). A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id.*

## V. ANALYSIS

### 1. Marvel's Appeal and Bessie's Cross-Appeal

Glenn died in 1993, and Lyle, the trustee, did not distribute the trust assets upon Glenn's death as required by the trust. As the county court observed, "Now, more than twenty years later, serious and difficult controversies have arisen . . . ." The county court made factual findings and applied equitable principles to craft a remedy. Marvel and Bessie now challenge that remedy, along with some of the factual findings upon which it is based.

The complications in this case have arisen, in large part, from Lyle's failure to inform the beneficiaries concerning the state of the trust over the course of many years. Accordingly, Marvel first assigns that the county court erred by finding no damages resulted when Lyle breached his fiduciary duty by failing to render timely accountings. Bessie also seeks damages resulting from Lyle's failure to render accountings.

[11,12] Marvel properly notes that a trustee has the duty to administer the trust in good faith, in accordance with its terms and the purposes and the interests of the beneficiaries, and in accordance with the Nebraska Uniform Trust Code. *In re Conservatorship of Abbott, supra*. The Nebraska Uniform Trust Code states that trustees owe the beneficiaries of a trust duties that include loyalty, impartiality, prudent administration, protection of trust property, proper recordkeeping, and informing and reporting. *Id.* Prior to January 1, 2005, a trustee was required to keep the beneficiaries of the trust reasonably informed of the trust and its administration and, on reasonable request, provide a beneficiary with a statement of the accounts of the trust annually. See, Neb. Rev. Stat. § 30-2814 (Reissue 1995); 2003 Neb. Laws, L.B. 130, § 78. Commencing January 1, 2005, the Nebraska Uniform Trust Code required a trustee to send to distributees at least annually a report of the trust property, liabilities, receipts, and disbursements. See, Neb. Rev. Stat. § 30-3878 (Reissue 2016); L.B. 130, § 78.

Lyle clearly violated the requirement, prior to 2005, to keep the beneficiaries of the trust reasonably informed; and after 2005, he violated his duty to send to distributees a report at least annually. The record reflects that Lyle did not provide any reasonable reports to Marvel and Bessie until 2008. Then, after this action was filed, Lyle provided an accounting from 2003 to 2012. Lyle contends that this was adequate, but we disagree. Failing to provide any information to the beneficiaries from the date of Glenn's death in 1993 until 2008 reflects a violation of Lyle's duties to report. Marvel and Bessie should not be required to initiate legal action to compel Lyle to comply with his statutory obligation. However, the question becomes, other than attorney fees, what damages have been shown by Marvel and Bessie.

[13] An accounting is ordinarily an appropriate remedy for a breach of the duty to inform and report. *In re Rolf H. Brennemann Testamentary Trust*, 288 Neb. 389, 849 N.W.2d 458 (2014). However, here, Marvel and Bessie have further alleged that Lyle must account for the damages he caused by his breach of duty as trustee and that a judgment should be entered against him. Specifically, Marvel claims that the measure of damages is a different distribution than was ordered by the county court, which difference would account for tax penalties, avoidable taxes, and excess interest paid when favorable IRS rates became unavailable, all due to Lyle's defaults, as well as unpaid rents, extra income taxes that would have been avoided by proper distributions, and attorney fees. Similarly, Bessie groups Lyle's failure to account with her assigned errors relating to the cattle operation, income distributions, and attorney fees and ultimately requests a different distribution as the remedy. Essentially, Marvel and Bessie incorporate all of their assigned errors in suggesting a measure of damages for Lyle's failure to render accountings. Therefore, we shall address these intertwined assignments of error together.

[14-17] In analyzing these assigned errors, we recognize that under Neb. Rev. Stat. § 24-517(1) (Cum. Supp. 2012),

county courts have exclusive jurisdiction over all matters relating to decedents' estates, including the probate of wills and construction thereof. *In re Estate of Stuchlik*, 289 Neb. 673, 857 N.W.2d 57 (2014), *modified on denial of rehearing* 290 Neb. 392, 861 N.W.2d 682 (2015). Although this case is not an equity action, in exercising exclusive original jurisdiction over estates, county courts may apply equitable principles to matters within probate jurisdiction. *Id.* We have held that county courts have jurisdiction over all subject matter relating to estates of decedents, including construction of wills and determination of heirs and successors of decedents, estates of protected persons, protection of minors and incapacitated persons, and trusts. *Id*. Such courts have full power to make orders, judgments, and decrees and to take all other actions necessary and proper to administer justice in the matters which come before them. *Id.*

In regard to distribution and valuation of trust assets, the county court was faced with when to value the assets, because contrary to the terms of the trust, the trust assets were not distributed at Glenn's date of death into three separate trusts. Lyle suggested that the county court divide Glenn's trust as of his date of death, according to the calculations of Lyle's expert, Bartruff. In finding that it could follow such an approach, the county court quoted the following portion of the Restatement (Third) of Trusts § 89, comment *g*. at 285-86 (2007):

> Occasionally the time for trust termination arrives and a directed division into separate trusts or distribution of the property is unduly delayed or disregarded even though the trustee has, in one way or another, performed other aspects of winding up the trust's affairs. . . . It would seem appropriate to treat the beneficiary . . . as owner [of] (or holder of a power of withdrawal over) the trust property or appropriate portion thereof—an example of equity treating as done what ought to have been done.

Rather than offering an alternative distribution schedule for the trust as of the time of Glenn's death, Marvel and Bessie

want the distributions and valuations to be deemed made at the time of trial. Marvel argues that the county court ought to have valued the trust assets as of 2016. She contends that we should adopt a rule that where distribution is delayed, as here, the assets should be valued as of the date of distribution. Marvel acknowledges that Nebraska has not addressed the valuation date for distributed assets. She points to *King v. Onthank*, 152 N.H. 16, 871 A.2d 14 (2005), where the lower court, upon termination of the trust, valued the assets at the time of distribution, which was 3 years after the grantor's death. The appellate court in *King v. Onthank* noted that the grantor's intent would control the date of valuation if such intent could be determined from the trust document. It ultimately held that under the particular facts presented, the lower court was not plainly erroneous in finding that the equitable date for valuation was approximately the date the trust assets were distributed.

Marvel also cites *Van Schaack v. AmSouth Bank, N.A.*, 530 So. 2d 740 (Ala. 1988), where the appellate court determined that trust assets should be valued at the date of distribution. However, in *Van Schaack v. AmSouth Bank, N.A.*, unlike the instant case, the terms of the decedent's will created and funded the residual trust.

We find *King v. Onthank, supra*, where the date of valuation of trust assets is determined by the particular facts presented to the lower court, to be more in line with our existing jurisprudence. For instance, in domestic relations cases, we have found that generally, the date on which a court values the marital estate should be rationally related to the property composing the marital estate. See *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). In other words, we look to the facts of each case.

Here, Lyle's expert, Bartruff, presented a report to opine a hypothetical balance sheet of the trust had Lyle timely filed the estate tax return, used all beneficial tax options, and paid the associated taxes on a deferred basis. Bartruff based the beginning values for the balance sheet on the final

values accepted by the IRS after negotiations. As provided by Glenn's trust, Bartruff split the beginning values into three equal trusts, with Lyle receiving the bank stock and Wayne's and Bessie's trusts receiving the remaining assets. He determined the net change to each trust based upon the cash inflows and outflows for various items, such as dividend income, ranching operations, fiduciary tax payments, and estate tax and interest payments. Additionally, Bartruff based his report on the position that the trust would not have been able to pay the estate tax liability as of the date of filing without having to liquidate some of the estate's assets. The record supports that Bessie did not want land or bank stock sold to pay the trust's tax obligations and that from 1993 to 2009, Marvel did not want land sold. Therefore, Bartruff determined the prudent course of action would have been to apply for a deferred payment plan with the IRS, which allowed reduced interest rates over several years. Based upon this analysis, he determined, using 2013 values, the ultimate division of the trust between the beneficiaries.

Marvel and Bessie assert that this approach is erroneous. They argue that Lyle benefited, since Lyle's treatment of expenses resulted in positive net income for the bank, whereas the assets assigned to Wayne and Bessie had negative income. Marvel and Bessie claim that Lyle should account for the loss of income to Wayne and Bessie because Lyle paid trust administration expenses using cattle operation income and not bank income. Bessie argues that the bank dividends at their present value should have been part of the residue, with the beneficiaries' trusts funded therefrom. However, an appellate court, in reviewing a judgment for errors appearing on the record, will not substitute its factual findings for those of the trial court when competent evidence supports those findings. *In re Estate of Dueck*, 274 Neb. 89, 736 N.W.2d 720 (2007). In its factual findings, the county court accepted the facts posited by Bartruff's calculations that divided the trust assets as of Glenn's date of death. In turn, the income and expenses associated with the trust assets followed the respective owners

of those assets. We conclude that the county court was not clearly wrong in adopting this approach. Therefore, with Bartruff's approach controlling, Marvel and Bessie's position concerning expenses and income has no merit.

The valuation of bank stock was another major difference of opinion between the parties that greatly affected valuation and distribution of trust assets. Marvel and Bessie endorse the testimony of Marvel's expert, Lockwood, who opined that the value of the bank stock was $9,804,000. On the other hand, Lyle's expert, Labenz, applied a lack of marketability discount and valued the bank stock at $7,209,000.

The county court found Lyle's experts to be more credible and accepted their opinions concerning these factual issues. In doing so, the county court was not applying an equitable principle, but simply, as the trier of fact, determining which expert was more credible. As such, we review the county court findings of fact for error on the record. See *In re Margaret Mastny Revocable Trust*, 281 Neb. 188, 794 N.W.2d 700 (2011). We find the decision to accept the testimony of Lyle's experts is supported by competent evidence and is neither arbitrary, capricious, nor unreasonable. See *In re Trust of Rosenberg*, 273 Neb. 59, 727 N.W.2d 430 (2007), and *In re Estate of Dueck, supra*.

As previously noted, the county court distributed the trust assets as follows:

**Lyle's Trust**

| | |
|---|---:|
| Bank Shares | $7,209,000 |
| Cash | 1,960,910 |
| Estate Tax Penalties and Interest | (854,803) |
| Adjustment for Williams Note, Allocated to Lyle | (61,423) |
| TOTAL for Lyle | $8,253,684 |

**Wayne's Trust**

| | |
|---|---:|
| One-half Land | $8,197,500 |
| Cash for one-half Williams Note | 30,711 |
| Cash | 274,860 |
| TOTAL for Wayne | $8,503,071 |

**Bessie's Trust**

| | |
|---|---|
| One-half Land | $8,197,500 |
| Cash for one-half Williams Note | 30,711 |
| Cash | 274,860 |
| Cash Adjustment | (167,550) |
| TOTAL for Bessie | $8,335,521 |

The county court accepted the blueprint for distribution as outlined by Lyle's experts, but the final values used by the county court were similar to the values that Marvel and Bessie requested in their briefs. The difference between the county court's final distribution of assets and that of Marvel and Bessie mainly stems from Marvel's and Bessie's claims that the bank stock should have been valued at $9,804,000, rather than $7,209,000, and that the bank dividend income increased the cash for Lyle.

Although we review the equitable question of distribution of the trust de novo, under the facts of this case, the county court could not render an equitable solution without first making factual findings as to which experts' opinions to accept. Because the county court accepted the expert opinions presented by Lyle as more credible, this, in turn, controlled the court's method of distribution. Certainly, other methods of distribution exist, but here, the distribution under this circumstance was reasonable.

The primary difference between Marvel's and Bessie's position and the county court's distribution is the extent to which the county court offset any alleged damages caused by Lyle. The county court only offset Lyle for any additional taxes and interest due to late filing, but Marvel and Bessie requested offsets for other issues, namely cattle operation rents, estate taxes, and the Williams note.

Marvel and Bessie contend that Lyle was not impartial in failing to collect rent for use of trust land for the cattle operation and that he should pay the associated damages.

[18] If a trust has two or more beneficiaries, a trustee has a duty of impartiality among beneficiaries. *In re Estate of*

*Stuchlik*, 289 Neb. 673, 857 N.W.2d 57 (2014), *modified on denial of rehearing* 290 Neb. 392, 861 N.W.2d 682 (2015). This includes a duty to act impartially in investing, managing, and distributing the trust property, giving due regard to the beneficiaries' respective interests. *Id.*

> "It is not only appropriate but required by the duty of impartiality that a trustee's treatment of beneficiaries, and the balancing of their competing interests, reasonably reflect any preferences and priorities that are discernible from the terms . . . , purposes, and circumstances of the trust and from the nature and terms of the beneficial interests." . . .

*Id.* at 689, 857 N.W.2d at 70 (emphasis omitted), quoting Restatement (Third) of Trusts § 79 (2007).

Prior to Glenn's death, Glenn, Lyle, and Wayne conducted a joint cattle operation using trust land without either Lyle's or Wayne's paying rent. Any profits were divided with Glenn receiving 20 percent, Lyle receiving 45 percent, and Wayne receiving 35 percent. This division of any profits continued after Glenn's death, with the trust receiving Glenn's 20-percent share. Marvel and Bessie claim that Lyle violated his fiduciary duties by continuing the cattle operation without collecting rents.

The county court concluded that Lyle had not breached his fiduciary duty regarding rents. It relied on the testimony of Krohn, an agricultural land manager. Krohn valued Lyle's and Wayne's labor and management of the cattle operation from 1994 to 2009 at $550,000. Krohn admitted that the trust could have received $600,000 more if they had liquidated the operation in 1993 or 1994 and leased the real estate until 2009. However, he also observed that it was reasonable for the cattle operation to continue at that time, despite the subsequent unexpected downturn in the cattle market, because cattle feeding operations were profitable in 1993 or 1994. In addition to Krohn's testimony, the county court acknowledged other evidence that Lyle and Wayne contributed real estate, cattle,

and equipment to the cattle operation. The county court did not expressly assign a value to these contributions, but it apparently found them, along with the labor and management valued by Krohn, similar to Lyle's and Wayne's rent obligations, had they been assessed.

In this case, the county court accepted Lyle's proposal to treat Glenn's trust as having been divided at Glenn's date of death. As a result, the county court effectively found that Lyle's trust should be entitled to the bank dividends, since the bank stock was his property. We find that a similar approach should have been applied to the land, which was treated by Lyle's expert as belonging jointly to Wayne and Bessie. If the land had been distributed upon Glenn's death, then the cattle operation would have been required to pay rent for using it. Any such rents would have been paid as follows: 20 percent by the trust, 45 percent by Lyle, and 35 percent by Wayne. Krohn opined that at market rates, the rent for pastureland would have been $2,100,000 between 1993 and 2009. Marvel claims that the county court should have assessed Lyle $1,433,544 (80 percent of $1,791,930) in uncollected land rent, and Bessie requested $1,716,743 (80 percent of $2,145,929).

We agree with Marvel and Bessie that Lyle, acting as an impartial trustee, should have treated the land as belonging to Wayne and Bessie, which, in turn, would have required the cattle operation to pay rent for using the land. Here, the record is clear that Bessie was unaware that rents were even an issue, since Lyle provided her no accounting as to the land. Wayne's situation is problematic because he was part of the cattle operation and had inside information as to whether rents were being paid. And the record is not clear as to whether Wayne demanded rent during his life, with Marvel testifying that she did the bookkeeping for Wayne's ranch operation and that when they "settled up" each year, they did not have any claim against the trust. Further, the reality is that Wayne, as co-owner of the cattle operation and of the land, could choose not to collect rent in regard to himself, and he has already

benefited by not being charged rents for his share of the cattle operation.

Although this is a breach of fiduciary duty action against Lyle, not Wayne, Lyle was still in a position of control in regard to Bessie's land, since he failed to provide her with any relevant financial information. Consequently, we conclude that Lyle breached his fiduciary duty as trustee to Bessie by his use of her one-half interest in the land and by personally benefiting from not collecting rents for his share of the cattle operation in the amount of $472,500 (45 percent of $1,050,000, which is one-half of $2,100,000). In addition, we conclude that Lyle further breached his fiduciary duty as to Bessie by failing to collect rents from Wayne for Wayne's use of Bessie's land, amounting to uncollected rent of $367,500 (Wayne's 35 percent of $1,050,000).

On remand, therefore, the distribution to Lyle's trust shall be reduced by $840,000 ($472,500 + $367,500) and said property shall be transferred directly to Bessie's trust.

Concerning federal estate tax obligations, the trust clearly provided that when Glenn, the grantor, died, Lyle's first obligation as trustee was to pay, either from trust principal or income, all of Glenn's legal obligations and all estate and inheritance taxes. Only after these obligations were paid was the residue of the trust to be divided equally among Glenn's living children or their surviving children. The evidence shows that Hocking prepared the federal estate tax return for Lyle to sign and that Lyle, without any adequate explanation, failed to timely file it. This resulted in the trust's incurring penalties and additional interest.

Marvel and Bessie claim that the county court erred in not awarding them damages by subtracting from Lyle's share approximately $2,200,000 representing the gross amount of penalties and interest associated with Lyle's lapses in filing and paying federal estate taxes. However, as noted by Lyle, Hocking negotiated a settlement with the IRS that allowed the trust to deduct the interest as an administrative expense, which in turn

directly reduced the federal estate tax liability and resulted in a fiduciary income tax benefit. Using this negotiated settlement, Bartruff calculated that the trust incurred damages of $854,803, which represented the difference between the amount that the trust actually paid for estate tax obligations and what would have been paid had the estate tax return been timely filed and the available beneficial election made. The county court again accepted the testimony of Lyle's experts and offset the amount of $854,803 against Lyle's share. We find the record contained competent evidence to support this decision.

Regarding the Williams note, Marvel claims that the county court erred when it failed to award damages against Lyle for failure to collect this valid debt owed to the trust. Lyle was not able to explain why he failed to collect on the note, but there was some evidence that he believed he could still do so. In the body of its order, the county court stated:

> The trust is the holder of a promissory note from . . . Williams where $61,423.00 remains uncollected. Although there was no evidence as to how Lyle breached his duties in not collecting this debt, this court believes equity requires allocating this note to Lyle's trust and therefore $30,711.00 additional cash should be allocated to Wayne's trust and $30,711.00 additional cash allocated to Bessie's trust.

The conclusion of the order contained a similar provision. However, the balance sheet attached to the court's order, entitled "EXHIBIT 'A,'" simply reflects that Wayne and Bessie each receive an "[u]ndivided one-half of . . . Williams [n]ote." This wording has apparently led Marvel to the conclusion that Wayne's and Bessie's trusts each received one-half of the note, rather than its cash value. We understand the confusion; and on remand, the county court shall amend the order's exhibit A to clarify that Wayne's and Bessie's trusts each receive an additional $30,711 of cash, as the body and conclusion of its order provide. With this finding and direction to the county court, this assigned error has no merit.

[19,20] Lastly, Marvel and Bessie claim that the county court erred in failing to award attorney fees and costs to them. Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of an attorney fee. See *In re Trust Created by Martin*, 266 Neb. 353, 664 N.W.2d 923 (2003). And in a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney fees, to any party, to be paid by another party or from the trust that is the subject of the controversy. Neb. Rev. Stat. § 30-3893 (Reissue 2016). When an attorney fee is authorized, the amount of the fee is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion. *In re Conservatorship of Abbott*, 295 Neb. 510, 890 N.W.2d 469 (2017); *Barnett v. Peters*, 254 Neb. 74, 574 N.W.2d 487 (1998); *Rapp v. Rapp*, 252 Neb. 341, 562 N.W.2d 359 (1997). A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *In re Conservatorship of Abbott, supra*.

The county court denied Marvel and Bessie attorney fees and stated in part:

As for Lyle's attorney fees and costs, generally a trustee would be allowed to be reimbursed from the trust those fees incurred in successfully defending against claims for breach of duty. Although in this court's opinion Lyle was largely successful in defending against the claims against him, there is no hiding that the trust lost $854,803.00 due to his neglect involving the estate tax issue. Further, although this court does not believe Lyle had mal intentions, it is true that Lyle's actions opened the door to being accused of breaches of fiduciary duties. His neglect with the [IRS], not providing annual

accountings, and lending money himself and through the bank, could reasonably create a suspicion of self-dealing. Lyle incurred significant attorney fees and costs in defending his actions, most of which this court has found to be acceptable. But, it's only because Lyle created the circumstances where it maybe was not unreasonable for others to doubt his conduct as being in their best interests. It is for these reasons this court feels that justice and equity require Lyle to be responsible for his own attorney fees and costs.

. . . .

. . . Again, to this court, the majority of those accusations were without merit. It is for these reasons this court feels that justice and equity require [Marvel and Bessie] to be responsible for their own attorney fees and costs.

We understand the county court's reluctance to award attorney fees, since the majority of the claims against Lyle were determined to be unfounded. But without an award of attorney fees, there is no penalty for not reporting to the beneficiaries for many years until the litigation occurred. As Marvel points out, in *In re Rolf H. Brennemann Testamentary Trust*, 288 Neb. 389, 849 N.W.2d 458 (2014), we found attorney fees were warranted where, similarly to this case, the trustees clearly breached their duty to inform and report for decades and the beneficiary had little choice but to file litigation to resolve any doubts about the trust's administration. And if we do not impose a penalty such as attorney fees in the instant case, then future trustees may believe that the statutory requirement to report has no significance. In addition, we have now found that Lyle breached his duties by the additional amount of $840,000. As a result, we find that the county court abused its discretion by not awarding attorney fees to Marvel and Bessie.

[21] We have previously found that to determine the value of legal services rendered by an attorney, it is proper to

consider the amount involved, the nature of the litigation, the time and labor required, the novelty and difficulty of the questions raised, the skill required to properly conduct the case, the responsibility assumed, the care and diligence exhibited, the result of the suit, the character and standing of the attorney, and the customary charges of the bar for similar services. See *In re Guardianship & Conservatorship of Donley*, 262 Neb. 282, 631 N.W.2d 839 (2001). And we have approved a contingent fee in trust litigation. See *In re Estate of Stull*, 261 Neb. 319, 622 N.W.2d 886 (2001).

The record reflects that this litigation was extensive, spanning several years. Trial lasted 4 days, and numerous exhibits and depositions were offered. We have concluded that Marvel and Bessie were successful in showing that Lyle breached his fiduciary duties and caused damages by failing to report and account for his failure to pay rents. Further, Lyle failed to act on several issues until litigation commenced; and the attorneys showed a high level of skill.

As set forth in the affidavit received at the hearing on attorney fees, Marvel's counsel seeks a contingent fee of 10 percent of the recoveries or distributions to Marvel, along with costs of $6,439.52. The actual recovery found by the county court was $854,803. We have now added damages of $840,000, but those are in regard to Bessie. Therefore, in light of the factors enumerated above, Marvel shall be awarded a total of $85,480 (10 percent of $854,803) in attorney fees and costs of $6,439.

Bessie requests an award for attorney fees of $81,910.13, costs of $4,510.66, and other expenses of $12,960.43, for a total of $99,381.22. Considering again the factors above, and the fact that Marvel brought this action, we award Bessie attorney fees of $40,955 and costs in the amount of $17,470.

This judgment against Lyle for attorney fees and costs in the total amount of $150,344 shall be a reduction in the distribution his trust receives, and $150,344 from the property in Lyle's trust or to be distributed shall be directly

transferred to the attorneys for Marvel and Bessie, according to this opinion.

## 2. Lyle's Cross-Appeal

On cross-appeal, Lyle assigns that the county court erred in failing to find that any claims by Marvel and Bessie were barred by the doctrine of laches.

[22-24] Laches occurs only if a litigant has been guilty of inexcusable neglect in enforcing a right and his or her adversary has suffered prejudice. *Cleaver-Brooks, Inc. v. Twin City Fire Ins. Co.*, 291 Neb. 278, 865 N.W.2d 105 (2015). Laches does not result from the mere passage of time, but because during the lapse of time, circumstances changed such that to enforce the claim would work inequitably to the disadvantage or prejudice of another. *Id.* What constitutes laches depends on the circumstances of the case. *Id.*

Lyle contends that it would be inequitable for Marvel and Bessie to bring actions against Lyle for breach of fiduciary duty after Lyle contributed part of his dividends from the bank stock toward payment of federal estate tax obligations. However, for laches to apply, the bank dividends would need to have been Lyle's property in the first place. This lawsuit was initiated, in part, to resolve whether the bank dividends were Lyle's. Therefore, the doctrine of laches does not apply. This assigned error is without merit.

Lyle also assigns that the county court erred in failing to find that any claims by Marvel and Bessie were barred by estoppel, waiver, release, consent, ratification, and acquiescence. Specifically, Lyle points out that Wayne and Bessie either participated in or knew about the cattle operation. We have already dealt with this allegation in addressing claims that Lyle failed to account for rents in the cattle operation. As a result, we will not address this issue again.

Lastly, Lyle claims that he should have been awarded attorney fees. We have already determined that Lyle breached his fiduciary duties; and, accordingly, he is not entitled to attorney fees.

## VI. CONCLUSION

Although we agree with most of the county court's findings, we conclude that the county court was clearly wrong in not awarding damages caused by Lyle's breaches of fiduciary duty in failing to provide timely reports and accountings that showed his failure to collect rents on behalf of the trust. Further, we conclude that the county court abused its discretion in declining to award attorney fees to Marvel and Bessie. Thus, we affirm in part, and in part reverse and remand with directions to apportion damages, attorney fees, and costs in accordance with this opinion.

Affirmed in part, and in part reversed
and remanded with directions.

Heavican, C.J., and Wright and Cassel, JJ., not participating.