IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MISLE V. SHRIER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

GAYLE MISLE, APPELLANT,

V.

LINDA SHRIER ET AL., APPELLEES.

Filed November 12, 2024.    No. A-24-010.

Appeal from the District Court for Lancaster County: DARLA S. IDEUS, Judge. Affirmed.

David A. Domina, of Domina Law Group, P.C., L.L.O., for appellant.

Lawrence K. Sheehan and Sara A. Pernicek, of Ellick, Jones, Buelt, Blazek & Longo, L.L.P., for appellees.

PIRTLE, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Gayle Misle appeals from the Lancaster County District Court's order denying her complaint for breach of fiduciary duties owed to the beneficiaries of the Abram Misle testamentary trust and denying her request for attorney fees. For the reasons stated herein, we affirm.

## II. STATEMENT OF FACTS

In February 2019, Gayle filed a complaint, which she later amended, alleging claims for breach of fiduciary duties by Linda Shrier and Marsha Misle-Haugland individually and as cotrustees of the Abram Misle testamentary trust for failure to properly administer, account, and report on trust-related matters. Later, O Street Development Co. ("O Street Development") and its president, Helen Misle; Abram, LLC; and Misle Properties, LLC ("Misle Properties"), were named as necessary parties to the proceedings. In her complaint, Gayle requested judicial supervision of

the trusts; disclosure of information sufficient to allow an accounting; damages against Marsha and Linda in favor of the trusts; surcharges against Marsha and Linda for the expenses of litigation and administrative costs; and payment of Gayle's attorney fees.

In the appellees' answer and counterclaim, they denied the allegations in the complaint and counterclaimed for payment of expenses incurred by the trust which were alleged to be the result of Gayle's unreasonable requests that resulted in excessive trust expenditures. The appellees separately filed a third-party complaint to add Howard Misle's estate as a party to the action because he managed, operated, and made significant decisions regarding a limited liability company (LLC) owned by the trust which decisions involved the same subject matter raised by Gayle, albeit directed against the trustees.

A trial was held over the course of 3 days. Testimony was adduced from James Watts, a certified public accountant; Gayle Misle; Marsha Misle-Haugland; Linda Shrier; and Jason Levy, Linda's son.

The evidence was undisputed that Abram Misle and Helen Misle were the parents of five children: Lynn Misle Weiner; Howard Misle; Gayle Misle; Linda Shrier; and Marsha Misle-Haugland. Abram Misle, and his brother, Julius, owned and operated auto dealerships on property they owned located on O Street in Lincoln, Nebraska. Abram's interest in the dealership was held in a corporation named HJA, Inc. (HJA).

In 1994, as part of his estate plan, Abram hired an attorney, David Ludtke, to draft his will. In his will, Abram appointed his wife, Helen, as the personal representative of his estate. As relevant to this appeal, the will provided that upon his death, his estate should be distributed and held in trust as follows:

> Item IV. <u>Marital Deduction. Pecuniary Formula Bequest. Maximize Unified Credit. Payable to The Spouse's Q-Tip Trust.</u> If my wife, HELEN MISLE, shall survive me, I give to my Trustee hereinafter named cash, securities or other property of my estate (undiminished by any estate, inheritance, succession, death or similar taxes) having a value equal to the maximum marital deduction -as finally determined in my federal estate tax proceedings less the aggregate amount of marital deductions, if any, allowed for such tax purposes by reason of property or interests in property passing or which have passed to my wife otherwise than pursuant to the provisions of this Item; provided, however, the amount of this bequest shall be reduced by the amount, if any, needed to increase my taxable estate (for federal estate tax purposes) to-the largest amount that, after allowing for the unified credit, against, the federal estate tax, and the state death tax credit against such, tax (but only to the extent that the use of such, state death-tax credit does not increase the death tax payable to any state), will result in the smallest (if any) federal estate tax being imposed on my estate. The term "maximum marital deduction" shall not be construed as a direction by me to exercise any election respecting the deduction of estate, administration expenses, the-determination of the estate tax valuation date, or any other tax election- which may be available under any tax laws, only in such manner as will result in a larger allowable estate tax marital deduction than if the contrary election had been made. My Personal Representative shall have the sole discretion to select the assets which shall constitute this, bequest. In no event, however, shall there be included in this bequest any asset or the proceeds of any asset which will not qualify for the federal estate tax marital deduction,

and this bequest shall be reduced to the extent that it cannot be created with such qualifying assets. My Personal Representative shall value any asset, selected by my Personal Representative for distribution in kind as a part of this bequest: at the value of such asset at the date of distribution of such asset.

ITEM V. <u>Residuary Gift to Trustee Under the Family Credit Shelter Trust</u>. I give all the rest, residue and remainder of my property of every kind and description (including lapsed legacies and devises), wherever situate and whether acquired before or after the execution of this Will to the Trustee of the Family Credit Shelter Trust. The Family Credit Shelter Trust shall be administered as hereinafter set forth.

Abram died in 1994. At the time of Abram's death, the property in his estate included his interest in HJA which held title to certain real estate on O Street. In 2000, while the estate was still open, the family sold the dealership, but HJA retained title to the real estate on O Street. In July 2003, HJA was reorganized into a new corporation named O Street Development, which served as a holding company for Abram, LLC, which held title to the O Street real estate. Shortly after the reorganization, the Q-TIP trust identified in Abram's will, was created and funded with the stock in O Street Development and its wholly owned subsidiary, Abram, LLC. Howard Misle was designated as the manager of Abram, LLC. In 2007, as a result of a debt problem, Howard sold the real estate on O Street to Hy-Vee and, through an Internal Revenue Code § 1031 Exchange, acquired three strip malls located in Pennsylvania. To best accommodate the exchange and the financing requirements of the transaction, Misle Properties was formed and held title to the strip mall located in Kimberly Plaza, while Abram, LLC, held title to the strip malls located at Greenville Crossing and Rossi Plaza. O Street Development remained the holding company for Abram, LLC, and Misle Properties with the exception that Helen Misle became a 1-percent owner in each LLC. The Q-TIP trust remained the 100-percent owner of the O Street Development. In 2010, Howard stepped down as the manager of the two LLC's and Linda took over as the manager of both companies.

James Watts testified that he provided accounting services to HJA beginning in 2001; helped with the reorganization of HJA into O Street Development in 2003; assisted with the exchange of the Pennsylvania strip malls; filed tax returns for the entities and the trust; and continuously provided accounting and tax services for the Q-TIP Trust, O Street Development, Abram, LLC, Misle Properties, and Helen Misle. Watts testified that the Q-TIP trust was funded with all the stock in O Street Development and that O Street Development owned both Abram, LLC, and Misle Properties, which held title to the Pennsylvania strip malls. Watts testified that he was not aware of any other assets that should have been funded into the Q-TIP trust. Watts testified that the purpose of Abram's will was to avoid the 50 percent federal estate tax and avoid income taxes to the beneficiaries by taking advantage of the $600,000 federal unified credit exemption. He testified that a life insurance policy paid out to two of Abram's children, which was subject to estate tax, was utilized to absorb the unified credit. Watts said that according to the Schedule M of the federal estate tax return, the amount distributed to the Q-TIP Trust was $2,601,860.48, and that along with the $500,000 life insurance policy paid to the children and the $100,000 for expenses

of administration that were used to absorb the unified credit exemption, there were no other assets available to fund the Family Credit Shelter Trust.

Watts testified that in 2018, Gayle requested information governing the trust. Watts testified that he provided Gayle with 3 years of tax returns and check registers, financial statements, and bank statements. Watts testified that Gayle continued to request additional information and, eventually, when the requests became too burdensome, Watts reached out to Marsha and Linda and informed them that he was going to have to start charging the trust to produce the documents. At that time, Watts testified that he was directed to stop providing any documentation to Gayle. Prior to Gayle's initial request for information in 2018, Watts testified that he had not received requests from any beneficiary to obtain information regarding the trust or its assets. Watts testified that throughout his time providing accounting and tax services, he had not witnessed Marsha or Linda engage in any improper conduct or imprudent transactions. He testified that he believed that not funding the Family Credit Shelter Trust was consistent with Abram's will and his purpose to avoid as much tax liability as possible and constituted "brilliant" estate planning.

Gayle testified that although she was appointed as cotrustee with Marsha, she did not accept the trusteeship and had never acted as a trustee. Gayle testified that despite her requests for information, she was not provided with any documentation until after she filed her lawsuit. Gayle testified that when she asked if the Family Credit Shelter Trust had been established, she was told that it was taken care of. Gayle testified that she never received anything in writing that summarized or described the debts of the trust, any of the companies it held, or any documentation to trace the assets owned by the trust. She testified that she was not consulted about the 2003 reorganization, nor was she ever provided with documentation describing the distribution of the assets into the trust. Gayle testified that the only information she knew was that the Pennsylvania strip malls were supposed to be in the trust. She further testified that until Watts testified at trial, she never had sufficient context to understand the annual reports that she did receive through discovery. Although she acknowledged that she received about 20,000 pages of documents through discovery, she testified that she had never received anything prior to filing her lawsuit and that she was unsure whether she had received all the information she was seeking. Gayle testified that she trusted Howard's business decisions and did not believe that he mismanaged the LLCs. She testified that she believed that the establishment of one of the trusts and not the other was improper and "what should be done is what is described in [Abram's] will." She testified that the Q-TIP trust was properly providing income to Helen and those distributions were appropriate. She testified that she was aware that the trust was making payments to Jason Levy, Linda's son, but did not know the extent of his services or the agreement that was in place. In addition, she testified that Marsha took a distribution of $100,000 to pay outstanding personal expenses and that it was a loan from the trust that was still on the books and had not been repaid.

Marsha testified that she had been appointed as one of the trustees and had served as the sole trustee since 2003 when the Q-TIP trust was established and funded. Marsha testified that the second trust was not established because "I don't think there was anything left other than the real estate to fund the Q Tip Trust." Marsha testified that she keeps track of the trust assets through the leases from the tenants, the separate checking accounts maintained for each strip mall, and the monthly records for each of the strip malls forwarded to their accountant. She testified that

essentially the real estate owned at the LLC level produced the business that flowed up to the trust. She testified that although there is not a consolidated record, Watts completed a balance sheet for each of the properties. Marsha acknowledged that she was provided $100,000 from the trust, but that Helen, Gayle, Linda, and Howard consented to it. She denied that it was a loan or that she had to pay it back and that if the record indicated that it was a loan, it was in error. Marsha denied that Linda ever acted as a trustee on behalf of the trust. Marsha testified that Gayle had not previously requested information regarding the trust until she had a dispute with Linda and that her dispute with Linda is the basis for the present action. Marsha testified that in 2018, Gayle requested information regarding the trust from Linda, but not from her.

Linda testified that she had no fiduciary role in the trust when the sale of the O Street real estate and subsequent § 1031 exchange was completed. Linda testified that she became the manager of the LLCs in 2010. Linda testified that when she took over, the strip malls were not completely occupied, and the trust was not producing cash flow to provide income to Helen. After attempting to work with two other businesses unsuccessfully, Linda's son, Jason Levy offered his services. Linda discussed the potential arrangement with Marsha and Marsha consented and drafted the consulting agreement. Thereafter, Jason was able to get all three strip malls occupied by tenants, which produced income for the trust. Linda testified that Gayle was aware that Jason was doing work for the trust. Linda denied acting as a trustee for the trust, keeping records or books for the trust, or signing on behalf of the trust.

Jason Levy testified that he had been in the real estate field for a little over 20 years, that he provides consulting services, and that he has a real estate broker license in Nebraska. Jason testified that he started providing services to the trust in 2014, but that he charged the trust a reduced fee from his customary rate. Jason testified that some months he did not receive payment from the trust for his services because the strip malls were operating at a deficit. He stated that now they are all currently producing income and are nearly 100 percent occupied with tenants. Jason testified that he also did not charge late fees or interest for the trust's failure to compensate him for his services although he normally would charge 16 percent for delinquent payments. As a result, he said that he has saved the trust the additional expenses it would have otherwise incurred. Jason testified that he received two separate payments for $90,000 in addition to his regular compensation. He testified that one payment was the 5 percent commission for establishing a new leasing tenant and the second payment was compensation that he had deferred until the trust was able to pay him for the services he already provided.

On December 29, 2023, the district court entered an order finding that

> Marsha has not breached her fiduciary duties. She has properly administered the QTIP Trust. Not funding the Family Trust was prudent and consistent with Abram's goal to avoid as much tax liability as possible under then existing laws. The only assets of the Q-TIP Trust are Abram, LLC and Misle Properties . . . There are no other assets that should have been placed in the QTIP Trust. The only debt of the QTIP Trust is a mortgage on one of the Pennsylvania properties.
>
> The sale of the property on O Street was justified by its indebtedness. The 1031 Exchange for the Pennsylvania property was done so that the trust could avoid tax liability and continue to provide income to Helen during her lifetime. All of the beneficiaries were

consulted when these decisions were made. Gayle was in favor of both the sale and acquisition of the properties in Pennsylvania.

Marsha has maintained adequate records. Gayle has been kept reasonably informed as to the trust, first by continuous communications and when that stopped, by having her requests for the production of documents met. Annual reports have been provided since 2019. Marsha has not engaged in self-dealing nor has she failed her duty of impartially.

Gayle has not suffered any harm or damages by the administration of the trust.

Gayle has not shown any breach by or liability on the part of any of the defendants.

[Gayle's] complaint is dismissed with prejudice. Marsha's Counterclaim is dismissed with prejudice. Each party is to pay his/her/its attorney fees and costs.

Gayle has now appealed from the district court's order dismissing her complaint.

## III. ASSIGNMENTS OF ERROR

Gayle assigns, renumbered and restated, that the district court erred in: (1) finding that she failed to prove her claims for breach of trust when the trustee (a) failed to administer the trust according to Abram's will by not funding the Family Credit Shelter Trust thereby allowing distribution of principal from the Q-TIP Trust in excess of limitations; (b) failed to provide annual accountings of the trust; (c) failed to keep adequate books or records for the trust; (d) failed to provide Gayle with requested information; (e) consented to an imprudent sale of the trust property and its imprudent reinvestment into the Pennsylvania strip malls; and (f) engaged in self-dealing when she took a $100,000 from the trust as a loan and failed to repay it; and (2) that the court erred in failing to award her attorney fees.

## IV. STANDARD OF REVIEW

Trust administration matters are reviewed for error appearing on the record, absent an equity question or question of law, which are instead reviewed de novo. *In re Masek Family Trust*, 312 Neb. 94, 977 N.W.2d 919 (2022). For errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id*. The interpretation of the words in a will or a trust presents a question of law. *In re Estate of Forgey*, 298 Neb. 865, 906 N.W.2d 618 (2018).

A trial court's decision awarding or denying attorney fees will be upheld on appeal absent an abuse of discretion. *In re Henry B. Wilson, Jr., Revocable Trust*, 29 Neb. App. 473, 956 N.W.2d 36 (2021). A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id.*

## V. ANALYSIS

### 1. CLAIMS FOR BREACH OF TRUST

Gayle generally assigns and argues that the court erred in finding that she failed to prove her claims for breach of fiduciary duty to the beneficiaries of Abram's testamentary trust created in his will, when the trustee (a) failed to administer the trust according to Abram's will by not funding the Family Credit Shelter Trust thereby allowing distribution of principal from the Q-TIP

Trust in excess of limitations; (b) failed to provide annual accoutings of the trust; (c) failed to keep adequate books or records for the trust; (d) failed to provide Gayle with requested information; (e) consented to an imprudent sale of the trust property and its imprudent reinvestment into the Pennsylvania strip malls; and (f) engaged in self-dealing when she took a $100,000 from the trust as a loan and failed to repay it; and (2) that the court erred in failing to award her attorney fees.

In *In re Estate of Forgey*, 298 Neb. at 881, 906 N.W.2d at 632, the Nebraska Supreme Court stated that

> a trustee has the duty to administer the trust in good faith, in accordance with its terms and the purposes and the interests of the beneficiaries, and in accordance with the Nebraska Uniform Trust Code. *In re Conservatorship of Abbott, supra*. The Nebraska Uniform Trust Code states that trustees owe the beneficiaries of a trust duties that include loyalty, impartiality, prudent administration, protection of trust property, proper recordkeeping, and informing and reporting. *Id*. Prior to January 1, 2005, a trustee was required to keep the beneficiaries of the trust reasonably informed of the trust and its administration and, on reasonable request, provide a beneficiary with a statement of the accounts of the trust annually. See, Neb. Rev. Stat. § 30-2814 (Reissue 1995); 2003 Neb. Laws, L.B. 130, § 78. Commencing January 1, 2005, the Nebraska Uniform Trust Code required a trustee to send to distributees at least annually a report of the trust property, liabilities, receipts, and disbursements. See, Neb. Rev. Stat. § 30-3878 (Reissue 2016); L.B. 130, § 78.

In order to prove a cause of action for breach of a fiduciary duty, the moving party must prove that appellees owed a fiduciary duty, that appellees breached that duty, that their breach was the cause of the injury to it, and that it was damaged. *In re Estate of Lakin*, 310 Neb. 271, 296-97, 965 N.W.2d 365, 385, *modified on denial of rehearing* 310 Neb. 389, 966 N.W.2d 268 (2021). Whether a breach of fiduciary duty has occurred is a question of fact. *Id*.

Every violation by a trustee of a duty required of it by law, whether willful and fraudulent, or done through negligence, or arising through mere oversight or forgetfulness, is a breach of trust. *In re Robert L. McDowell Revocable Trust*, 296 Neb. 565, 894 N.W.2d 810 (2017). To succeed on a claim for breach of fiduciary duty, a plaintiff must prove that the defendant's breach of fiduciary duty caused the plaintiff damages and the extent of those damages. *In re Louise V. Steinhoefel Trust*, 22 Neb. App. 293, 854 N.W.2d 792 (2014).

### (a) Failure to Administer Trust in Accordance With Will

Gayle first argues that the court erred in finding that she failed to prove that the trustee breached her fiduciary duty to the beneficiaries of the trust when she failed to administer the trust in accordance with Abram's will. She argues that the will expressly designated the creation of two separate trusts, and that the evidence during the trial is undisputed that a second Family Credit Shelter Trust was to be formed and funded, but the trustee failed to do so. She then argues that this failure resulted in excessive distributions from the Q-TIP trust.

Gayle's argument relates to Articles IV and V of Abram Misle's last will and testament. She argues that Marsha breached her fiduciary duty to the beneficiaries of the Family Credit Shelter Trust because the Family Credit Shelter Trust was never funded.

Because Helen Misle survived Abram, Article IV provided that Abram's personal representative should first fund his Q-TIP Trust with estate assets

> having a value equal to the maximum marital deduction as finally determined in my federal tax proceedings . . . provided, however, the amount of this bequest shall be reduced by the amount, if any, needed to increase my taxable estate (for federal estate tax purposes) to the largest amount that, after allowing for the unified credit, against, the federal estate tax, and the state death tax credit against such, tax (but only to the extent that the use of such, state death tax credit does not increase the death tax payable to any state), will result in the smallest (if any) federal estate tax being imposed on my estate.

Article V then provided that the rest, residue, and remainder of the estate assets would flow to the Family Credit Shelter Trust.

As it relates to this distribution scheme, Watts, a CPA, testified that because Abram's estate included life insurance proceeds made payable to certain children of Abram which were taxable to the estate, those proceeds along with certain expenditures absorbed the entirety of the federal unified tax credit exemption. As such, he testified that the remaining assets all qualified for the marital deduction as contemplated in Article IV, which meant there was nothing left in the residue of the estate to fund the Family Credit Shelter Trust. He testified that, under these circumstances, funding only the Q-TIP Trust was a correct interpretation of the will. In fact, he testified that this distribution scheme reflected "brilliant" estate planning, and that he individually would not do it any other way.

Gayle did not call an expert at trial to refute any of Watts' testimony. Instead, Gayle simply argued that pursuant to the plain terms of the will, the Family Credit Shelter Trust was required to be funded, and Marsha breached her fiduciary duty in failing to do so. During oral argument, Gayle's counsel was asked whether he believes the estate was required to pay estate tax on the taxable life insurance policy in favor of funding the Family Credit Shelter Trust even though that would result in reducing the net value of the estate. Counsel argued that the tax should have been paid, the Family Credit Shelter Trust should have been funded, and that it was a breach of fiduciary duty not to do so. We disagree. Under the plain terms of Article IV of the will, the marital trust was to be funded and only reduced by "the amount, *if any*, needed to increase my taxable estate (for federal estate tax purposes) to the largest amount that, after allowing for the unified credit, against, the federal estate tax. . .will result in the smallest (if any) federal estate tax being imposed. . ." (Emphasis supplied.) Clearly, the language contemplates a scenario, under the plain language used, where the marital trust is not reduced if no amount is needed to absorb the unified credit through the Family Credit Shelter Trust, and the language of the will requires funding of the trust or trusts so as to result in the smallest, if any, federal estate tax being imposed. In funding only the marital Q-Tip Trust and utilizing the unified credit against the taxable life insurance policy, we find that not funding the Family Credit Shelter Trust was both consistent with the language in the will and resulted in minimizing the federal estate tax paid. As such, we find no error on the record in the district court's conclusion that Marsha did not breach her fiduciary duty by not funding the Family Credit Shelter Trust.

Gayle's claim that the trustee allowed excessive distributions from the Q-TIP trust is tied to her claim that the Family Credit Shelter Trust should have been funded. In short, she argues that

the will directed Helen to receive up to a 5 percent annual principal distribution from the Q-TIP Trust and that the annual distribution would have been smaller if the Family Credit Shelter Trust would have been funded. Because we rejected Gayle's claim that the trustee should have funded the Family Credit Shelter Trust, we likewise reject her claim that the trustee breached her fiduciary duty by providing 5 percent annual principal distributions on the larger value of the Q-TIP trust. This assignment fails.

### (b) Failure to Provide Annual Accounting

Gayle next assigns that the district court erred in failing to find that she proved her claims for breach of fiduciary duty when the trustee failed to provide her with annual accountings of the trust's property, liabilities, receipts, and disbursements.

In so far as this claim relates to a trustee's obligation to annually report, the subject is covered by Neb. Rev. Stat. § 30-3878 (Reissue 2016). That statute provides, in relevant part:

> (a) A trustee shall keep the qualified beneficiaries of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests. Unless unreasonable under the circumstances, a trustee shall promptly respond to a beneficiary's request for information related to the administration of the trust.
>
> . . . .
>
> (c) A trustee shall send to the distributees or permissible distributees of trust income or principal, and to other qualified or nonqualified beneficiaries who request it, at least annually and at the termination of the trust, a report of the trust property, liabilities, receipts, and disbursements, including the source and amount of the trustee's compensation, a listing of the trust assets and, if feasible, their respective market values. Upon a vacancy in a trusteeship, unless a cotrustee remains in office, a report must be sent to the qualified beneficiaries by the former trustee. A personal representative, conservator, or guardian may send the qualified beneficiaries a report on behalf of a deceased or incapacitated trustee.
>
> (d) A beneficiary may waive the right to a trustee's report or other information otherwise required to be furnished under this section. A beneficiary, with respect to future reports and other information, may withdraw a waiver previously given.

Gayle takes issue with the trustee's failure to provide her with an annual accounting. But an annual accounting is only required as to the distributees or permissible distributees of trust income or principal. Qualified or nonqualified beneficiaries are only entitled to such reports if requested. The terms of Abram's will unequivocally provided that the only distributee of income and principal from the Q-TIP trust during Helen's lifetime was his wife, Helen. As such, Gayle was only entitled to the information provided in § 30-3878(c) upon request. And the record demonstrates that Gayle's first such request for information was in 2018. So insofar as Gayle is claiming the trustee breached her duty to her by not providing the information required under § 30-3878(c) annually, we find no error on the record associated with the district court's finding that there was no such breach of duty associated with this alleged failure to annually report. Insofar as Gayle is arguing the trustee breached her duty by failing to adequately provide this information annually to Helen, there was no testimony as it relates to what specifically was or was not provided to Helen annually, the degree of what she requested or otherwise waived, or whether she was in

any way dissatisfied with the level of annual reporting to her. On this record, we find no error with the district court's finding that the trustee did not breach her duty to annually account.

### (c) Failure to Maintain Adequate Trust Records

Gayle next assigns that the district court erred in finding that she failed to meet her burden to prove that the trustee breached her duty to maintain adequate trust records.

Neb. Rev. Stat. § 30-3875 (Reissue 2016) provides, in relevant part, that "[a] trustee shall keep adequate records of the administration of the trust." As it relates to that duty, it is well established that where a trustee fails to maintain proper records, all doubts regarding his administration of the trust are resolved against him. *In re Rolf H. Brennemann Testamentary Trust*, 288 Neb. 389, 849 N.W.2d 458 (2014).

We read Gayle's third assignment and argument as a generalized claim that Marsha failed to maintain proper records of trust matters since the time it was originally funded in 2003. Since that time, the trust assets have changed in that the primary asset was real estate located on O Street in Lincoln and was ultimately exchanged into three strip malls located in Pennsylvania. And the structure of the investment changed in that the Q-TIP Trust originally owned all of the stock in O Street Development, which owned 100 percent of the membership interest in Abram, LLC, which held title to the O Street property. Following the exchange, the Q-TIP Trust continued to own all of the stock in O Street Development, which owned 99 percent of Abram, LLC, and Misle Properties, which held title to the strip malls in Pennsylvania. We note that the record indicates that Helen was made a 1 percent owner of these LLCs in order to accomplish the like-kind exchange and financing related to the transaction. In that regard, Watts testified that he has always served as the accountant for the trust and its corresponding entities, appropriately accounted for the transactions and tax requirements, and knew of no abnormalities associated with the transactions, services, or uses of money produced by the income-producing assets. In that regard, as we understand it, Gayle now takes issue with the manner in which Watts has maintained records based upon this long history of transactions and events.

But similar to Gayle's claim governing the administration of the trust, Gayle provided no expert testimony at trial that refuted Watts' testimony that he completed "appropriate" accounting reports, adequately maintained records, and accounted for the transactions involving the trust's assets. Instead, Gayle appears to take issue with the manner in which Watts reported on the innerworkings of the trust assets that flow from the revenue produced by the LLCs to the holding company and eventually the trust. On this record, where there is no evidence of any financial abnormalities over the years of the trust's existence, with the accounting being kept by the longstanding CPA and with no expert testimony that refutes Watts' testimony that he has keep "appropriate" accounting records for the trust and its assets, we find no error on the record governing the district court's finding that the trustee maintained adequate records for the trust.

### (d) Failure to Provide Requested Information

Gayle next assigns that the district court erred in finding that she failed to prove her claim for breach of fiduciary duty when the trustees failed to provide her with requested information.

In order to prove that a trustee breached their duty to inform and report, a beneficiary must show that as a beneficiary, she was entitled to certain information, and that the trustees had not

provided it. *In re Rolf H. Brennemann Testamentary Trust*, 288 Neb. 389, 849 N.W.2d 458 (2014). An accounting is ordinarily an appropriate remedy for a breach of the duty to inform and report. *Id*. And if ordered, the trustees would have had the burden to prove its completeness and accuracy once questioned. *Id.*

As we noted before, because Gayle is not a current distributee of income or principal from the Q-TIP Trust, her right to reporting is tied to her specific requests. And the record reflects that Gayle did not make specific requests for information until 2018. As it relates to the timing of that request, the evidence reflects that Gayle and the other members of the family were previously kept apprised of the transactions and dealings of the trust since its inception in 2003, and that Gayle's formal request in 2018, apparently made to Linda and not Marsha, may have related to a separate disagreement with Linda involving a nonrelated matter. Regardless, once the request was made, Gayle was entitled to reporting provided in § 30-3878(c).

The record indicates that the specific request for a report was made by Gayle to Watts and Linda, and Watts testified that he responded by providing Gayle with tax returns, check registers, bank statements, and reports which contained financial statements for Abram, LLC, and Misle Properties, which owned the assets and associated debt, along with an explanation of how the structure worked together. Watts testified that additionally he commissioned a meeting at Marsha's direction to provide an opportunity for Gayle to ask questions and obtain specific accounting records; and the record reflects that over the course of time following Gayle's initial request for information, the trustee and/or Watts eventually provided over 20,000 documents in attempt to satisfy Gayle's requests. As we stated before, Gayle did not provide expert testimony to establish that the means and manner by which Watts and the trustee ultimately reported the innerworkings of this structure were inadequate or failed to reasonably inform Gayle about the trust's administration and material facts necessary for the beneficiaries to protect their interests. The record also demonstrates that prior to Gayle's specific request for information in 2018, the trustee engaged in discussions with the family, including Gayle, to apprise them about acts and doings regarding the trust and its associated businesses and assets. Taken together, we cannot say that the trial court erred in finding that the trustee did not breach her duty by failing to provide Gayle was requested information related to the trust.

(e) Imprudent Transactions

Gayle next assigns and argues that the court erred in failing to find that the trustee breached her duty to the beneficiaries by allowing the sale of the O Street real estate and allowing the proceeds to be exchanged for the Pennsylvania strip malls. In support of her argument, Gayle cites to Neb. Rev. Stat. §§ 30-3869 and 30-3883 (Reissue 2016).

Section 30-3869 provides that "[a] trustee shall administer the trust as a prudent person would, by considering the purposes, terms, distributional requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution." Section 30-3883 provides:

> (a) Except as otherwise provided in subsection (b) of this section, a trustee who invests and manages trust assets owes a duty to the beneficiaries of the trust to comply with the prudent investor rule set forth in sections 30-3883 to 30-3889.

(b) The prudent investor rule, a default rule, may be expanded, restricted, eliminated, or otherwise altered by the provisions of a trust. A trustee is not liable to a beneficiary to the extent that the trustee acted in reasonable reliance on the provisions of the trust.

Gayle argues that Marsha's act of allowing the property to be sold and exchanged into the Pennsylvania properties violated the trustee's duty to prudently administer trust affairs and make prudent financial decisions and that the court erred in failing to find that Marsha's failure to stop those transactions, which occurred in 2007, constituted a breach of her duties. We disagree.

As it relates to this claim, it is unrefuted that although the trust owned O Street Development, which owned Abram, LLC, which held title to the O Street real estate at the time of the sale, Howard was the LLCs' manager and recommended the sale due to debt problems associated with the business. Nevertheless, Gayle argues that Marsha, as the trustee of the Q-TIP Trust that owned O Street Development, should have stopped this sale and exchange that took place in 2007 and her failure to do so is a breach of her duty as trustee.

First, we note that at the time of the sale and exchange, the O Street real estate was held by Abram, LLC. According to Abram, LLC's operating agreement, the manager of the LLC had the following authority on behalf of the entity:

5.2 Specific Authority of the Manager. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, but subject in all events to the Shareholders Agreement, and except as limited, restricted or prohibited by the express provisions of this Agreement, each Manager, whether acting alone or in concert with any other Manager (if there is more than one Manager), is hereby authorized, for and on behalf of the Company to:

(a) Acquire by purchase, lease, exchange or otherwise any real or personal property which may be deemed by the Manager to be necessary, convenient or incidental to the business of the Company; . . .

As such, the authority to exchange the O Street real estate for other property was in the manager's exclusive control as opposed to the control of the LLC's members. At the time of the transaction, according to the record, Howard was the sole manager of the LLC and made the decision based upon the then current debt position of the LLC. As such, on the face of the operating agreement, the authority to exchange the property was reserved to the manager and not the sole member of Abram, LLC, which was O Street Development. And the Q-TIP Trust's interest in the transaction was limited to its ownership interest in O Street Development. In that regard, Gayle failed to produce any evidence as to how Marsha had authority as trustee to manage the outcome of the investment decision by Howard. Further, Neb. Rev. Stat. § 30-3898 (Reissue 2016) provides:

A trustee is not liable to a beneficiary for breach of trust if the beneficiary consented to the conduct constituting the breach, released the trustee from liability for the breach, or ratified the transaction constituting the breach, unless:

(1) the consent, release, or ratification of the beneficiary was induced by improper conduct of the trustee; or

- 12 -

(2) at the time of the consent, release, or ratification, the beneficiary did not know of the beneficiary's rights or of the material facts relating to the breach.

As it relates to that 2007 sale and exchange, Gayle testified that she did not oppose the sale of the O Street property or the subsequent reinvestment in the Pennsylvania strip malls because "I decided that Howard was the one with the professional experience, so I would go with his judgment." She further testified that she was aware that Marsha had reservations regarding the purchase of the Pennsylvania properties, but that ultimately, she "decided to go with my brother's judgment."

The general testimony related to this transaction, which occurred nearly 17 years ago, was that the beneficiaries consented to the sale and exchange by Howard on the basis that they trusted his judgment, as evidenced by the authority conferred upon him in the operating agreement. Although Marsha testified to having reservations regarding the transaction, she, like Gayle, testified that she did not halt the sale or exchange because she was trying to be collaborative with the family and the majority agreed that the transaction was necessary. Under these circumstances, as it relates to Gayle's claim some 17 years later that Marsha breached her duty to the trust by not stopping the transaction, we find no error on the record associated with the district court's finding that this conduct did not constitute a breach of duty.

### (f) Self-Dealing

Gayle next assigns that the district court erred in finding that she failed to prove her claim that Marsha breached her duty to the trust by engaging in self-dealing when Marsha loaned herself $100,000 and failed to repay it.

We first note that it is undisputed that following the sale of the O Street real estate, Marsha received $100,000 of the sale proceeds from Abram, LLC, to pay personal expenses. At the time she received the funds, Marsha testified that she sought and received permission from Helen and that Howard, Linda, and Gayle consented to her receipt of the funds on a conference call. As testified by Watts, the $100,000 is maintained on the balance sheet of Abram, LLC, as being a loan to Marsha. Gayle testified that at the time Marsha requested the funds, Gayle was informed about it and she understood that Marsha would receive a loan to pay outstanding bills. She testified that it was her understanding that the loan was still showing on the books of Abram, LLC.

As we noted above, business decisions involving the LLC were made at the discretion of the manager and Gayle provided no evidence of how the trustee individually had authority over that transaction. And separately, § 30-3898 states that a trustee is not liable to a beneficiary for breach of trust if the beneficiary consented to the conduct constituting the breach absent some improper conduct or material misrepresentation of facts. Because it is undisputed that Gayle consented to the loan that Marsha received, and Gayle does not allege that the consent was induced by improper conduct or due to a material misrepresentation of facts, we find no error in the district court's conclusion that Marsha did not engage in self-dealing when she received a $100,000 loan from the trust in 2007.

### 2. ATTORNEY FEES

Gayle argues that the court erred in refusing to award her attorney fees.

Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of an attorney fee. *In re Henry B. Wilson, Jr., Revocable Trust*, 29 Neb. App. 473, 956 N.W.2d 36 (2021). In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney fees, to any party, to be paid by another party or from the trust that is the subject of the controversy. *Id*. See, also, Neb. Rev. Stat. § 30-3893 (Reissue 2016). When an attorney fee is authorized, the amount of the fee is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion. *In re Henry B. Wilson, Jr., Revocable Trust, supra*.

Here, Gayle's allegations that Marsha breached her duties as the trustee were unfounded. Generally, attorney fees are warranted if the beneficiary is successful in showing a breach of fiduciary duty and damages. See *In re Estate of Forgey*, 298 Neb. 865, 906 N.W.2d 618 (2018). Therefore, having failed to successfully prove her claims that the trustee breached her fiduciary duties, we find that the district court did not abuse its discretion in failing to award attorney fees in favor of Gayle.

## VI. CONCLUSION

For the reasons stated above, we affirm.

AFFIRMED.